**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                              )

**JUAN MORGAN,**              )
                              )

         **Plaintiff,**        )
                              )

        **v.**                 )     **Civil Action No. 05-0989 (RCL)**
                              )

**THOMAS J. VILSACK, SECRETARY,**  )
**UNITED STATES DEPARTMENT**    )
**OF AGRICULTURE**            )
                              )

         **Defendant.**     )
_____)

## MEMORANDUM OPINION

Plaintiff Juan Morgan, a former employee in the United States Department of Agriculture's Foreign Service ("Department"), brings this action against defendant Thomas Vilsack in his official capacity as Secretary of Agriculture (collectively called "Department").[1] Morgan alleges that the Department, through its Animal and Plant Health Inspection Service ("APHIS"), discriminated against him on account of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e _et seq._, and created a hostile work environment. Currently before the Court is defendant Department's Motion [55] for Summary Judgment and plaintiff's Cross-Motion [63] for Summary Judgment. For the reasons set forth below, the Court will grant the Department's motion and deny plaintiff's cross-motion.

## I.    FACTUAL BACKGROUND

Plaintiff is an African American U.S. citizen of Hispanic descent, originally born in Panama. (Morgan Dep. 302:5–6, Feb. 23, 2009; Morgan Decl. on Summ. J. Mot. ("Morgan

---

[1] Plaintiff's complaint originally named Mike Johanns as defendant. (_See_ Compl. [1] at 2.) Under Rule 25(d), if a public officer sued in his or her official capacity ceases to hold office, "the officer's successor is automatically substituted as a party." FED. R. CIV. P. 25(d). Upon assuming office, Secretary Vilsack became defendant in this case.

Decl.") ¶ 3.) Prior to his service with APHIS, plaintiff spent 22 years in the United States Army working throughout Central and South America, finally retiring as a Lieutenant Colonel. (Pl.'s Statement of Uncontested Facts [hereinafter Pl.'s Facts] ¶¶ 1–2.) In September 2000, plaintiff accepted a Limited Non-Career Appointment ("LNCA") with the International Services branch of APHIS ("APHIS-IS"). (Def.'s Statement of Material Facts Not in Genuine Dispute [hereinafter Def.'s Facts] ¶ 2.) APHIS-IS assigned plaintiff to the Panama City, Panama office, where he became Director of Finance of the Panama-U.S. Screwworm Commission. (*Id.* ¶ 3.) The Commission is a joint venture between the governments of the United States and Panama, comprised of APHIS employees and the Panama Ministry of Agriculture and Livestock Development employees. (Cielo Decl. ¶ 2.) Throughout his tenure with APHIS-IS, plaintiff's first-line supervisor was James Swenson, the co-Administrative Director of the Commission; he also reported to the Panamanian co-Administrative Director, Luis Delegado. (Def.'s Facts ¶¶ 5, 12; Morgan Decl. ¶ 9.) The Commission's co-Directors were Dr. John Wyss (followed by Dr. Angel Cielo) for the United States and Dr. Jose Espinosa for Panama. (Def.'s Facts ¶¶ 7, 9, 11.) Plaintiff's responsibilities included reporting to both directors. (Morgan Decl. ¶ 9; Def.'s Facts ¶ 13.)

Immediately upon arriving in Panama, plaintiff claims he suffered from harassment, hired only as a "token" African American employee. (Morgan Decl. ¶ 11.) The Department's rationale for hiring plaintiff was to improve the service APHIS-IS received in the Panama City office. (Wyss Aff. [56-6] at 2.) Indeed, Dr. Wyss hired plaintiff after a chance encounter on an airplane and thought he would be a good employee; Dr. Wyss took the effort to closely monitor Plaintiff's employment paperwork, going through "lots of hoops" to ensure they were quickly processed. (*Id.*)

Despite Dr. Wyss thinking that plaintiff would be a good employee, Mr. Swenson received complaints about plaintiff from members of APHIS-IS staff and the American Embassy in Panama from the beginning of plaintiff's tenure. (Def.'s Facts ¶ 14.) These complaints only magnified throughout the years, trickling up to Dr. Cielo, the co-Director of the Commission. (*Id.* ¶ 23.) Mr. Swenson consistently rated Plaintiff's work product as "satisfactory, but no better," despite plaintiff averring that no complaints were lodged against him. (*Id.* ¶ 19; Morgan Decl. ¶¶ 29, 42.)

Plaintiff's availability changed drastically one year into his LNCA. His daughter was diagnosed with cancer in fall 2001, which required plaintiff to travel back and forth to the United States for her treatment. (Morgan Decl. ¶ 34; Def.'s Facts ¶ 15.) As a result, plaintiff was absent from Panama for two weeks per month. (Morgan Decl. ¶¶ 35, 43; Def.'s Facts ¶ 16.) During plaintiff's absences, APHIS-IS and Commission staff had to rely on subordinates for information and management responsibility, even though plaintiff was available by telephone.

Throughout plaintiff's tenure with APHIS-IS—culminating in the termination of his LNCA in March 2003 (Def.'s Facts ¶ 72)—plaintiff claims the Department subjected him to ten discrete instances of unlawful discrimination: (1) exclusion from a June 2002 meeting; (2) the July 2002 selection of Ivan Bustos for a position in the Finance Department over his objection; (3) receipt of oral reprimands in November 2000 and February 2003; (4) supervisors periodically asking subordinates for financial information; (5) exclusion from APHIS-IS social functions; (6) non-receipt of an Annual Expectation Letter before February 8, 2001, and non-receipt of a new Annual Expectation Letter thereafter; (7) receipt of a performance evaluation for the 2001-2002 rating period with critical comments from Dr. Harold Hoffman, plaintiff's second-line supervisor; (8) non-receipt of mid-year reviews during the 2000-2001 and 2001-2002 rating

periods; (9) non-conversion to Career Foreign Service Status; and (10) termination of his Foreign Service LNCA. These claims of intentional discrimination led plaintiff to file suit against the Department.[2]

After APHIS-IS terminated plaintiff's LNCA in 2003, before he could complete his reassignment to Riverdale, Maryland, plaintiff suffered a nervous breakdown requiring professional medical treatment. (Morgan Decl. ¶ 109; Ex. 23 (letter from Dr. Dorian Lagrotta, Psychiatrist).) Because of plaintiff's medical situation and his pending legal claims, plaintiff retired on disability rather than return to the APHIS civil service in Riverdale. (Ex. II [57-2] at 10; Ex JJ [57-2] at 12.)

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party's evidence is to be believed, and all reasonable inferences from the record are to be drawn in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986). It is not enough, however, for the non-moving party to show that there is "*some* factual dispute." *Id.* at 247. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Thus, summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

---

[2] The specific factual background for each of these claims is discussed in greater length *infra* Part III.B.2.

## III.    <u>TITLE VII CLAIM</u>

Plaintiff has alleged racial and national origin discrimination claims against defendant in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. As noted above, plaintiff has identified ten alleged discriminatory actions that form the basis of his Title VII claim.

The Department contends that plaintiff's alleged discriminatory actions (1)-(8) do not constitute adverse employment actions and therefore fail as a matter of law.  In the alternative, the Department contends that its non-discriminatory rationale for the alleged discriminatory actions (1)-(8) is not pretext for unlawful discrimination.  The Department concedes that plaintiff's alleged discriminatory acts (9) and (10) are adverse employment actions, but maintains that the Department's non-discriminatory rationale for those actions is not pretext for discrimination.  As set forth below, the Court agrees with the Department's arguments.

*A. Legal Standard*

Traditionally, with a Title VII discrimination claim, district courts were required to apply a three-step burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under that framework, the plaintiff must first prove a *prima facie* case of discrimination.  *Id.* at 802.  If the plaintiff is successful, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  Finally, if the defendant satisfies its burden, the plaintiff must prove that the defendant's stated reason is pretext for discrimination.  *Id.* at 804-05.

In *Brady v. Office of Sergeant at Arms*, the Court of Appeals simplified the District Court's analysis in Title VII disparate-treatment suits.  520, F.3d 490, 494 (D.C. Cir. 2008). Stating that the *prima facie* determination had become a "largely unnecessary sideshow," the court held that in Title VII disparate-treatment suits, the District Court need not determine if the

plaintiff makes a prima facie case of discrimination if the defendant has asserted a legitimate, non-discriminatory reason for the challenged actions. *Id.* As a result, this Court is left with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or notional origin?" *Id.* In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the Department's non-discriminatory reasons are mere pretext for underlying unlawful discrimination.

Before the Court can undertake that inquiry, however, the Court must determine whether the alleged acts of discrimination constitute adverse employment actions. *Douglas v. Donovan*, 559 F.3d 549, 551-52 (D.C. Cir. 2009). For an employment action to be adverse, it must result in "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Accordingly, an adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Id.* at 552 (internal citation and quotation omitted). Alleged acts of discrimination that do not constitute adverse employment actions fail as a matter of law. *Brantley v. Kempthorne*, 2008 WL 2073913, at *4-*5 (D.D.C. May 13, 2008).

*B. Analysis*

  *1. Adverse Employment Actions*

  The Department contends that plaintiff's alleged discriminatory actions (1)-(8) do not constitute adverse employment actions because these actions did not have a materially negative effect on the terms or conditions of plaintiff's employment. The Department admits that actions (9) and (10) constitute adverse employment actions.

  The Court finds that plaintiff's alleged discriminatory actions (1)-(8) do not constitute adverse employment actions and fail as a matter of law. It is clear that (1) plaintiff's exclusion from a June 2002 meeting; (2) the July 2002 selection of Ivan Bustos for a position in the Finance Department over plaintiff's objection; (3) plaintiff's receipt of oral reprimands in November 2000 and February 2003; (4) supervisors periodically asking plaintiff's subordinates for financial information; (5) plaintiff's exclusion from APHIS-IS social functions; (6) plaintiff's non-receipt of an Annual Expectation Letter before February 8, 2001, and his non-receipt of a new Annual Expectation Letter thereafter; and (8) plaintiff's non-receipt of mid-year reviews during the 2000-2001 and 2001-2002 rating periods fail to have a materially negative effect on the terms or conditions of plaintiff's employment. Indeed, plaintiff does not dispute the Department's assertion that these alleged discriminatory actions do not constitute adverse employment actions.

  Plaintiff, however, does dispute the Department's contention that the alleged act of discrimination (7) does not constitute an adverse employment action. Plaintiff's alleged act of discrimination (7) is plaintiff's receipt of a performance evaluation for the 2001-2002 rating period that contained critical comments. Ordinarily, negative performance evaluations do not constitute adverse employment actions. *Douglas*, 559 F.3d at 552. If, however, a negative

performance evaluation denies the employee "the opportunity to compete for a promotion, [he] has suffered an adverse employment action." *Id.* Thus, the Court must look to whether the harm alleged from the discriminatory act is speculative. *Id.*

Here, the alleged harm—plaintiff's non-conversion to Career Foreign Service status—is speculative. Plaintiff's performance evaluation for the 2001-2002 rating period did not result in plaintiff's non-conversion to Career Foreign Service status. The Foreign Service selection board used a variety of factors when it decided against converting plaintiff to Career Foreign Service, including recommendations against converting plaintiff from two additional supervisors. (Def.'s Ex. Q.) Thus, no reasonable fact finder could find that plaintiff suffered a tangible harm as result of plaintiff's performance evaluation for the 2001-2002 rating period. Accordingly, plaintiff's alleged discriminatory actions (1)-(8) do not constitute adverse employment actions.

### 2. *Pretext for Unlawful Discrimination*

Defendants next argue that the legitimate non-discriminatory reasons for the ten alleged acts of discrimination are not pretext for discrimination. As set forth below, the Court agrees with defendant.[3]

### a. *Exclusion from a June 2002 meeting*

Plaintiff's first alleged act of unlawful discrimination is his exclusion from a June 2002 meeting in Panama City. Plaintiff asserts that this was a "major meeting" involving personnel from the United States and Panamanian governments, as well as APHIS-IS staff from Riverdale, Maryland. (Morgan Decl. on Summ. J. Mot. ¶ 44.) He also alleges that all other commission staff members knew of the meeting and because of this failure of communication, APHIS-IS treated

---

[3] With respect to plaintiff's alleged discriminatory acts (1)-(8), the Court's findings below are in the alternative because the Court concluded above that those acts do not constitute adverse employment actions.

him as an "[in]significant part of the US management team" who could be "safely [] ignored." (*Id.*)

The Department offers a number of reasons why plaintiff would have been excluded from the meeting. First, Mr. Swenson, plaintiff's first-line supervisor cannot recall if plaintiff received an invitation to the meeting or not. (Swenson Decl. ¶ 20.) Second, assuming that plaintiff was not invited to attend, the justification is one of three reasons: (1) the issues to be discussed were not financial in nature; (2) Mr. Swenson felt comfortable discussing any financial-related matters that might arise; or (3) the meeting was limited to the APHIS-IS Executive Committee which did not include plaintiff. (*Id.*; *see also* Def.'s Mot. for Summ. J. [55] at 37.)

Each of these non-discriminatory reasons for plaintiff's exclusion—assuming that plaintiff was not invited despite Mr. Swenson's inability to recall—suffice to show that no reasonable jury would find the justifications pretextual. First, if the meeting agenda had no financial-related matters, then plaintiff, as director of the finance office would have no need to be present unless his duties had been expanded; the record makes no mention of increased responsibility of the plaintiff beyond the financial concerns of the Commission and APHIS-IS activities within the Central American Region. Second, Mr. Swenson was the co-Administrative Director of the Commission and supervised plaintiff to ensure that plaintiff's work product met APHIS-IS expectations. This shows that Mr. Swenson understood the basic financial nature of the Commission and was confident that he could address any financial related matters if the need arose. Indeed, plaintiff supplied Mr. Swenson with financial data and spreadsheets in the days before the June 2002 meeting; had Mr. Swenson needed more information, the easiest way to do so would have been to contact plaintiff. (*See* Morgan Dep. 168:5–9, Feb. 23, 2009.)

Finally, the Director of Finance was not on the Executive Committee. (*See* Swenson Decl. ¶ 20 (noting that no department chiefs were members of the Executive Committee).) If the meeting only required the Executive Committee, of which plaintiff was not a member, plaintiff's exclusion is justified. As a result, no reasonable jury could find that such justification is pretextual for discrimination. Plaintiff claims further, though, that Otis Sollami, the director of the procurement office—the same rank on the department hierarchy chart as plaintiff—attended the meeting as well. (Morgan Decl. ¶ 46.) But without proof of such attendance by Mr. Sollami, plaintiff's assertion is baseless. Thus, the Department's non-discriminatory justification for the June 2002 meeting is not pretextual.

> b. *The July 2002 selection of Ivan Bustos for a position in the Finance Department over plaintiff's objection*

Plaintiff's second alleged discriminatory action is the selection of Ivan Bustos for a position in the Finance Department over plaintiff's objection. The selection process for the position resulted in a tie between Ivan Bustos and plaintiff's preferred candidate. (*See* Ex. K [56-13] at 32.) Two members preferred Ivan Bustos; plaintiff and Otis Sollami preferred the other. In order to break the tie, Mr. Delegado—the Panamanian co-Administrative Director of the Commission—suggested that Maria de la Madrid, the accounting supervisor in the finance department decide, because she had experience working with both candidates. (*Id.*) Ms. de la Madrid selected Ivan Bustos for the position, to the surprise of some at the Commission. (*Id.*) At the time Ms. de la Madrid made her decision, plaintiff was not in Panama.[4] (*Id.*)

The Department's non-discriminatory justification for the action taken is that the decision was assigned to Ms. de la Madrid, who at the time was acting as Chief of Finance while plaintiff

---

[4] Plaintiff, throughout 2002, traveled out of the office for two weeks of every month, related to his daughter's cancer diagnosis and treatment. (Morgan Decl. on Summ. J. Mot. ¶ 43.)

was outside of Panama. (Def.'s Mot. for Summ. J. [55] at 38.) This non-discriminatory justification could not be found pretextual by a reasonable jury. Plaintiff was not in Panama at the time that the hiring decision was made. Thus, this decision was properly left to the acting Chief of Finance. Moreover, although plaintiff was available by telephone, his support for the other candidate led to the tie, which necessitated a tie-breaker. It was quite reasonable for Ms. de la Madrid, the acting Finance Chief, who had experience working with both employees, to make the decision that Ivan Bustos had the best credentials for the job. There is no indication in the record that the Department purposefully bypassed plaintiff in the decisionmaking process because of race or national origin. Indeed, plaintiff had a vote for the candidate; his preferred choice just did not ultimately succeed.

### c. Receipt of Oral Reprimands in November 2000 and February 2003

Plaintiff's third alleged discriminatory action consists of the oral reprimands he received on two separate occasions. The first occurred shortly after plaintiff arrived in Panama to work for the Commission in November 2000; the second occurred in February 2003 during plaintiff's interim evaluation meeting. (Def.'s Mot. for Summ. J. [55] at 36.)

The November reprimand stemmed from plaintiff's decision to audit Commission field offices without informing Luis Delegado, the Panamanian co-Administrative Director of the Commission. (Swenson Decl. ¶ 19; Ex. E [56-13] at 17 (noting that Mr. Delegado told Dr. Swenson that plaintiff "had to understand that he worked for us [both American *and* Panamanian co-Administrative Directors] and that he couldn't just come and go as he pleased").) Plaintiff concedes that, in his position as Finance Director of the Commission, he reported to both Mr. Swenson and Mr. Delegado. (Morgan Decl. on Summ. J. Mot. ¶ 9; *see id.* ¶ 24 (reiterating that plaintiff never informed the Panamanian officials of his planned, unannounced audits).) Still,

plaintiff contends that his unannounced audits were merely good accounting practices. (*See id.* ¶ 24.) This Court is not fluent in what are and are not good—or even best—accounting practices. All that matters is that, in spite of such good accounting practices, the Commission required plaintiff to inform both his American and Panamanian supervisors of audit plans. He did not inform his Panamanian supervisor as he was required to do, and consequently, he was reprimanded. No reasonable jury could find that this justification is pretextual for unlawful discrimination.

The February 2003 oral reprimand[5] occurred during plaintiff's interim evaluation meeting with Mr. Swenson. (Ex. V [56-14] at 10.) The meeting focused on plaintiff's job performance up to that point, resulting in Mr. Swenson's oral "reprimand." (*Id.*) Mr. Swenson focused on a number of problems with plaintiff's work: (1) plaintiff did not take initiative to call attention to potential problems or issues; (2) plaintiff's failure to discuss in more detail problems with certain cash funds, rather than just compile a report; and (3) plaintiff's failure to compile certain monthly status-of-funds reports—or the failure to communicate that such reports had been compiled. (*Id.*) Mr. Swenson's concern with plaintiff's job performance had developed over the course of plaintiff's employment. (*See* Swenson Decl. ¶ 14; *see also* Ex. W [56-14] at 12 (where Mr. Swenson, after noting many of the same problems, stated that plaintiff "continued to perform at a minimum level of effort" and that Mr. Swenson "expected more of a person in [plaintiff's] position as head of a major Commission department").)

Here again, the reprimand stemmed from less than satisfactory performance in the tasks assigned to plaintiff, even after plaintiff's supervisor communicated that his performance had been less than satisfactory. No reasonable jury could find this justification a pretext for

---

[5] The Department characterizes this, though, as nothing more than oral "guidance" about plaintiff's work product. (Def.'s Reply in Supp. of its Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. [80] at 7.)

discrimination; all they could find is a supervisor attempting to work with an employee to improve performance.

Plaintiff does point out, though, that there are procedures in place for unsatisfactory job performance. (*See* Pl.'s Cross-Mot. for Summ. J. [63] at 25; *see also* Pl.'s Ex. 6 (describing APHIS-IS guidelines for either an improvement strategy or, for more severe problems, a Performance Improvement Plan ("PIP")).) Plaintiff is wrong to rely on the Department's failure to adhere to these procedures to prove pretext. First, as far as the PIP is concerned, the supervisor is only obligated to initiate one if, and only if, the *supervisor* judges the performance deficiencies to be severe. (*See* Pl.'s Ex. 6.) There is nothing in the record to indicate that Mr. Swenson adjudged plaintiff's performance problems to be severe; plaintiff's own subjective view of the situation is not enough for a PIP to be initiated. Second, even if the Department failed to follow the guidelines setting forth performance review requirements and improvement plans for deficient performance, this cannot turn the non-discriminatory oral reprimand into unlawful discrimination. At most, it just shows that the Department—through Mr. Swenson—failed to comply with procedure. No reasonable jury could find the Department's non-discriminatory justification to be pretextual.

> d. *Supervisors periodically asking subordinates for financial information*

Plaintiff's fourth alleged discriminatory action stems from plaintiff's supervisors periodically asking subordinates for financial information. The Department readily admits that such activities did occur, but explicitly notes that such actions were taken for efficiency reasons. (Swenson Decl. ¶ 21.) The Department notes that obtaining financial information directly from the source of the information saved time; a one-step process, rather than a two-step process (using plaintiff as intermediary) aided both Mr. Swenson and Mr. Delegado in execution of their

responsibilities. (*Id.*) Also, starting in the fall of 2001, plaintiff left Panama for weeks at a time to care for his daughter. (*Id.*; *see also* Morgan Decl. ¶¶ 34, 43.) Plaintiff maintains that, despite his absences, he was available by phone twenty-four hours a day. (*Id.* ¶ 43.) Even so, the Department cannot be expected to call plaintiff while out of Panama for every financial related task that needs to be completed. (*See* Ex. K [56-13] at 32.)

Plaintiff also avers that this direct-to-subordinate communication violated the rules. (Pl.'s Cross-Mot. for Summ. J. [63] at 6.) He directs attention to comments by Dr. Angel Cielo, the then-Director of the Commission. (Cielo Dep. 25: 2–6, Nov. 16, 2007.) The Department offers a lengthy justification that Dr. Cielo's comments, when contextualized, do not and cannot mean what plaintiff ascribes to them. (Def.'s Reply in Supp. of its Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. [80] at 11.) This Court agrees with the Department's view of the comments. Earlier in the deposition, Dr. Cielo talked about protocol and chain-of-command concerns regarding his Panamanian counterparts. Dr. Cielo stressed that he did not want Panamanian officials who had concerns with American APHIS-IS employees to directly address the employee; he wanted the coordinate American counterpart to be notified first. (Cielo Dep. 24: 3–13, Nov. 16, 2007.) Nothing in the record indicates that Department employees violated the rules, nor does the method chosen by the Department to efficiently further the Commission's work—especially when plaintiff absented himself for weeks at a time—allow a reasonable jury to conclude that these justifications are pretextual.

*e. Exclusion from APHIS-IS Social Events*

Plaintiff's fifth alleged discriminatory act is his exclusion from APHIS-IS social events. Plaintiff can only identify two discrete events where he was not invited—Dr. Wyss' son's birthday party and a fishing trip on Otis Sollami's boat. (Def.'s Mot. for Summ. J. [55] at 27.)

Aside from these two instances, plaintiff offers only generalized assertions that he was excluded from APHIS-IS social functions; the record does not reflect such exclusion though. Dr. Swenson, at least on one occasion, invited plaintiff to his home for a dinner party. (Morgan Dep. 266-267: 23–1, Feb. 23, 2009; Swenson Dep.45:4–15, Sep. 4, 2008.) Indeed, Dr. Swenson cannot recall any APHIS-IS social event to which plaintiff was not invited; if such omission did occur, it was likely due to oversight and not hostility. (Swenson Decl. ¶ 23.) Rather than APHIS-IS staff excluding plaintiff from events, the converse seems true: plaintiff chose to extricate himself from the social events. (*See* Ex. V [56-14] at 11 (noting that APHIS-IS staff frequently requested plaintiff to join them for lunch, but that plaintiff consistently refused because he should be able to choose how he spends his lunch period).) Nothing in the record indicates that plaintiff was excluded from any event—and if he was, not for discriminatory reasons.[6] Accordingly, no reasonable jury could find that the Department's non-discriminatory justification is pretextual.

### f. Non-Receipt of an Annual Expectation Letter before February 8, 2001

Plaintiff's sixth alleged discriminatory action is his non-receipt of an Annual Expectation Letter—a letter developed annually that clarifies, among other things, the employee's job description, primary responsibilities, and expectations for the appraisal period (*see* Def. Ex. 6 (APHIS Directive 4430.2))—before February 8, 2001, months after he began his tenure with APHIS-IS. (*See* Ex. J [56-13].) Plaintiff further complains of the Department's failure to issue a new Annual Expectation Letter thereafter. (*See id.* (noting that according to Department policy, the letter is "developed annually").) Despite plaintiff's failure to receive his letter prior to February 8, 2001, the Department told plaintiff the nature of his duties and plaintiff acted in

---

[6] Though Dr. Swenson mentioned that any exclusion would have been due to negligence, another possible, non-discriminatory reason is that plaintiff's demeanor and personality bristled other members of the APHIS-IS staff. (*See* Swenson Decl. ¶¶ 9–10.)

conformity with those duties throughout his employment. (*See* Swenson Aff., Oct. 8, 2003; *see also* Morgan Dep. 181:22–184:5, Feb. 23, 2009.) As for the failure to issue a new Annual Expectation Letter, the Department offered two reasons for this inaction: (1) plaintiff's job description did not change; and (2) the "common practice" of the Panama City APHIS-IS office did not involve issuing new letters when no substantive change in job description occurred. (Def.'s Mot. for Summ. J. [55] at 39.)

Plaintiff expends much energy on his claim that the Department failed to "follow the rules." (*See* Morgan Decl. on Summ. J. Mot. ¶ 15.) But this energy, much like that expended on his oral reprimand claim, does not amount to pretext; at most, it elucidates a Department office that is not following the guidelines of every policy document exactly as written.

The Department's justifications cannot be found by a reasonable jury to be pretextual. First, as already noted, plaintiff had been informed of his job duties. The delay in its receipt is not shown, anywhere on the record, to be based on plaintiff's race or national origin. Though plaintiff avers that he requested multiple times for the letter (*see id.*), the Department did not find it necessary to issue it forthwith, confident in the knowledge that plaintiff had been informed of his duties. Plaintiff is correct when he writes that the letter "is the frame upon which mid year and year-end evaluations are to be built" (*see id.*), but there is nothing to indicate that Mr. Swenson, plaintiff's first-line supervisor, would be unable to evaluate plaintiff's work performance absent the official expectation letter. Second, regarding the lack of a new expectation letter, the Panama City office had a customary rule that, absent new job requirements, a new letter would not be issued. There is nothing to suggest this is based on animus; rather, it is the institutional decision of the Panama City office to not fix what is not broken. Indeed, Mr. Swenson's own Annual Expectation Letter was three years old. (*See*

Swenson Aff. [56-9] at 3.) In fact, Mr. Swenson—an APHIS-IS supervisor—explicitly stated

that his understanding of Department policy mandated that no new letter be issued absent a

change in employment responsibilities. (*See id.*) As such, no reasonable jury could find pretext

for unlawful discrimination.

g.   *Receipt of a Performance Evaluation from 2001-2002 with Critical*

*Comments from Dr. Harold Hoffman*

Plaintiff's seventh alleged discriminatory action is the 2001-2002 performance evaluation

with critical comments by Dr. Harold Hoffman.  Dr. Hoffman, in 2002, became plaintiff's

second-line supervisor, *i.e.*, Mr. Swenson's supervisor, replacing Dr. John Wyss. (*See* Cielo

Decl. ¶ 4.) Plaintiff strenuously asserts that Dr. Hoffman never became his second-line

supervisor (*see* Morgan Decl. ¶¶ 62–3), but the record reflects that Dr. Hoffman, prior to Dr.

Cielo's formal assignment, took over as plaintiff's second-line supervisor. (*See* Hoffman Aff.

[56-8] at 1 (but noting that after formally becoming plaintiff's supervisor in July 2002, Dr.

Hoffman could not recall if "[anyone] ever communicated that change to [plaintiff]").)

In plaintiff's 2001-2002 performance evaluation, Dr. Hoffman wrote that "[c]onflict and

confrontation has arisen in [plaintiff's] contact with several members of the U.S. and

Panamanian Sections" and that until plaintiff's communication with APHIS-IS Commission staff

improved, he "should not be placed on tenure tract or promoted." (*See* Def. Ex. 7.) The

communication problems noted by Dr. Hoffman had reached a point where both co-

Administrative Directors of the Commission jointly penned a letter to the co-Directors of the

Commission, venting their frustration about the lack of communication between plaintiff and

themselves. (*See* Def. Ex. 29 (also noting that no such problem existed between them and Otis

Sollami, the procurement chief).)  In the end, Dr. Cielo hired a private consulting firm, at great

expense, to implement a plan to improve relations between plaintiff and other APHIS-IS staff. (*See* Ex. G [56-13] at 20 (e-mail from Dr. Cielo to plaintiff informing him of this plan); *see also* Ex. H [56-13] at 25 (report of Prince & Phelps Consultants); Ex. I [56-13] at 27 (showing the cost of Prince & Phelps as $16,310.00).)

The 2001-2002 evaluation also included comments by Mr. Swenson, and plaintiff had an opportunity to respond to such comments. (*See* Ex. D [56-13] at 12–5 (showing plaintiff's dispute of his job performance by Mr. Swenson despite Mr. Swenson commenting that plaintiff had done a "commendable job of carrying out his duties and responsibilities during the rating period . . . .").) Dr. Hoffman, though, after learning of the problems between plaintiff and other Commission staff, found it necessary to include his comments; he did not do so for discriminatory reasons, but in an attempt to alleviate the communication problem and resolve conflicts. (*See* Hoffman Aff. [56-8] at 4 ("[Plaintiff] was not performing at the level we would expect."); Hoffman Dep. 33:1–16, Sep. 5, 2008 [56-11] at 3.) Plaintiff's generalized refutation of these conflicts and communication problems by claiming that Dr. Hoffman is biased is not enough to sustain pretext. *See Woodruff v. Peters*, 482 F.3d 521, 533 (D.C. Cir. 2007) (noting that courts review "not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers"). Nothing in the record disclaims Dr. Hoffman's asserted belief that his comments were necessary to spur a change in the existing tension between plaintiff and other staff. Despite plaintiff's wish that self-serving statements in his favor will refute a non-discriminatory reason for the action taken, those statements cannot be given the weight he desires. Accordingly, no reasonable jury could find that Dr. Hoffman's actions were pretext for discrimination; these were actions taken by a supervisor to diffuse a tense work environment.

### h. Non-receipt of Mid-Year Reviews for 2000-2001 and 2001-2002

Plaintiff's eighth alleged discriminatory action is his non-receipt of mid-year reviews during the 2000-2001 ratings period and the 2001-2002 ratings period. The Department offers the non-discriminatory justification that Mr. Swenson—plaintiff's first-line supervisor—did not, as a matter of course, provide mid-year reviews. (*See* Swenson Decl. ¶ 22 [56-4] at 6.) Mr. Swenson noted that Otis Sollami, the procurement chief, did not receive a mid-year review—nor, to his knowledge, did any APHIS-IS employee in Panama—and that he himself did not receive one. (*Id.*) Once the outside consulting firm concluded its report, calling for more frequent meetings between plaintiff and his supervisors, Mr. Swenson conducted a mid-year review. (*See* Ex. U [56-14] at 8 (review concluded on Dec. 16, 2002).)

Nothing in the record, or plaintiff's reply, contradicts the Department's justification that in the Panama City office, the custom was—much like with Annual Expectation Letters—to not conduct mid-year reviews. Thus, no reasonable jury could find that such practice—among all staff members—was pretext for unlawful discrimination.

### i. Non-Conversion to Career Foreign Service Status

Plaintiff 's ninth alleged discriminatory action is his failure to be converted from his LNCA position to career foreign service. Plaintiff requested to be converted to career foreign service status in July of 2002. (*See* Ex. N [56-13] at 40 (letter from plaintiff to Mr. Swenson with request).) The decision to convert or not convert plaintiff was decided by a Conversion Committee. (*See* Ex. Q [56-14] at 4 (listing committee members).) The Committee based its decision to not convert plaintiff (Ex. R [56-14] at 5) on a complete review of plaintiff's last two performance evaluations—one of which included critical comments by Dr. Hoffman—and comments from plaintiff's supervisor, reviewing official and regional director. (Ex. Q [56-14] at

4.) The comments received by the Committee from both Dr. Swenson and Dr. Cielo recommended that the Committee not convert plaintiff. (Ex. O [56-14] at 1 (noting that plaintiff's conversion would not be in his best interests or that of APHIS-IS especially because of the uncertainty of plaintiff's presence in Panama due to his daughter's illness and the uncertainty about her progress); Ex. P [56-14] at 3 (noting that previous letters of complaint about plaintiff could not be ignored and that "in fairness to all and in the interest of [APHIS-IS], that IS, DO NOT covert [plaintiff] . . . .").)

The Committee's decision to not convert plaintiff did not fatally affect plaintiff's career. The Committee, in its letter to plaintiff, specifically informed him that he was free to continue serving out the remainder of his LNCA position—not to exceed five years— and that he could request reconsideration for conversion to career foreign service status one year later. (Ex. R [56-14] at 5.)  Plaintiff contends that unlawful discrimination tainted the Committee's decision because Dr. Cielo ordered Dr. Swenson to change his recommendation to the Committee— namely, to remove a second option that would have converted plaintiff and then rotated him to Washington, D.C., to be more available for his daughter's cancer treatments. (*See* Pl.'s Cross-Mot. for Summ. J. [63] at 21; *see also* Cielo Decl. ¶ 17 [56-5] at 4.) But this one incident is not enough to change the basic nature of the candidate review process undertaken by the Conversion Committee: a complete review of all the materials requested by the Committee. As the Department notes in its reply, the "anti-discrimination laws were not intended to render the judiciary a super-personnel department that re-examines an entity's business decisions." (Def.'s Reply in Supp. of its Mot. for Summ. J. and its Opp'n to Pl.'s Cross-Mot. for Summ. J. [80] at 23–4 (*quoting Adeyami v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (internal quotation marks omitted).)  Moreover, the Committee's decision, based on the totality of the

circumstances, did not single out plaintiff based on his race or national origin. At the Committee meeting deciding plaintiff's request, only two other requests were denied—both white men. (Ex. S [56-14] at 6.) Finally, though Dr. Wyss, a member of the Committee, mentioned that plaintiff's supervisory chain did not recommend him for conversion, a necessary requirement to him, this does not suffice to establish that Dr. Cielo's and Dr. Swenson's recommendations were definitive. (*See* Wyss Aff. [56-6] at 4.) Dr. Wyss was but one member of a seven-member committee; the factors he found dispositive in denying plaintiff's request may not have been as weighty for, or necessary, to other members of the panel. (*See id.*)

Accordingly, the non-conversion of plaintiff to career Foreign Service status resulted from a committee meeting in Washington, DC, reviewing the totality of plaintiff's employment file. They did not see fit to grant his request; but this did not foreclose all possibilities of conversion to plaintiff. No reasonable jury could conclude that this decision was pretext for unlawful discrimination.

### j. Termination of Plaintiff's LNCA

Plaintiff's tenth and final alleged discriminatory actions is the termination of his LNCA in March of 2003. (*See* Ex. CC [56-14] at 47 (letter from Ralph Iwamoto, Deputy Administrator of APHIS, to plaintiff informing him of the termination).) APHIS based its decision to terminate plaintiff's LNCA on (1) an alphabetical ranking of plaintiff among his peers indicating he is not competitive against them and ineligible for performance awards, (2) the decision of the Conversion Committee not to convert plaintiff to career foreign service status, and (3) ongoing performance below what is expected of someone in plaintiff's position. (*Id.* (noting that these factors are non-exclusive).) This termination of plaintiff's LNCA did not sever his employment with APHIS, however, because his previous employment in APHIS's civil service afforded him

reemployment rights to another civil service position and because APHIS assigned plaintiff to a position in Riverdale, Maryland. (*See id.*; *see also* Ex. FF [57-2] at 2 (reiterating the position in Maryland while postponing the transition date).) Despite this offer of further employment with APHIS, plaintiff retired due to disability rather than report to Riverdale, Maryland. (Ex. II [57-2] at 10; Ex. JJ [57-2] at 12.)

The Department's asserted non-discriminatory justification for plaintiff's LNCA termination is much the same as used in the non-conversion to career foreign service status. After a thorough review of plaintiff's employment file, the Department no longer had confidence in plaintiff's ability to fully perform his duties. (*See* Def.'s Mot. for Summ. J. [55] at 44.) Plaintiff has not offered any direct evidence that would show pretext on behalf of the Department aside form his own subjective claim of discriminatory animus. This cannot suffice to overcome plaintiff's burden to prove pretext. *See Felder v. Johanns*, 595 F. Supp. 2d 46, 70 (D.D.C. 2009) ("A plaintiff cannot establish pretext simply based on his own subjective assessment of his own performance, for plaintiff's perception of hi[m]self, of his work is not relevant. It is the perception of the *decisionmaker* which is relevant." (internal quotation marks omitted)). Dr. Iwamoto, one of the members of the Conversion Committee, perceived the situation, based on the factors laid out in his letter to plaintiff, that plaintiff's continued LNCA employment was no longer justified.  No reasonable jury could find pretext in this justification.

*        *        *

In sum, the Court concludes that plaintiff's alleged discriminatory actions (1)-(8) do not constitute adverse employment actions and fail as a matter of law.  In the alternative, plaintiff has failed to prove that the Department's non-discriminatory justifications for the alleged discriminatory actions (1)-(8) were pretext for unlawful discrimination.  In addition, the Court

concludes that plaintiff has failed to prove that the Department's non-discriminatory justifications for the alleged discriminatory actions (9) and (10) were pretext for unlawful discrimination. Accordingly, the Court will grant the Department's motion for summary judgment on the Title VII claim.

## IV.    <u>HOSTILE WORK ENVIRONMENT CLAIM</u>

In addition to the employment discrimination claim, plaintiff also claims that the actions of defendant constituted a hostile work environment. For the reasons set forth below, the Department's motion for summary judgment on this claim will be granted.

*A. Legal Standard*

In order to determine if a hostile work environment exists, the Court must find that the work environment is sufficiently hostile or abusive by "looking at all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Supreme Court has elucidated this threshold by noting that the "behavior [must be] so *objectively* offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 79, 81 (1998) (emphasis added).

If instances of discriminatory conduct are found, the objective severity of the harassment should be judged "from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances." *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 77 (D.D.C. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). These standards are "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted). But isolated incidents

of discriminatory conduct will not suffice to sustain a hostile work environment claim; rather, the discriminatory acts must be pervasive and prolonged. *See Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) ("[A] workplace environment becomes hostile for the purposes of Title VII only when offensive conduct permeates the workplace with discriminatory [conduct] . . . ." (internal quotation marks and alterations omitted)); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (noting that five discrete acts of discriminatory conduct over a two-year period were insufficient to constitute a hostile work environment).

   *B. Analysis*

Under the hostile work environment standard set forth in *Faragher*, plaintiff's claim fails. Despite plaintiff's fastidious subjective belief that his tenure at APHIS-IS was plagued with discriminatory animus and conduct, he simply has not produced a factual showing of the *objective severity* required by *Faragher* and its progeny. Plaintiff uses the same ten incidents of alleged discrimination in his Title VII claim; this "bootstrapping" of claims simply cannot form the basis of a hostile work environment claim. *See Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005) (noting that a plaintiff cannot "bootstrap" discrete allegedly discriminatory incidents "into a broader hostile work environment claim"). Also, these ten events, spread over a period of three years, simply cannot be found to be so objectively hostile, especially in light of other cases with less frequency of allegedly discriminatory conduct. *See Akonji*, 517 F. Supp. 2d. at 98.

Finally, when it is reiterated that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances," *Harris*, 590 F. Supp. 2d at 77, plaintiff's hostile work environment evaporates. As severe as the subjective hostility appeared to plaintiff during his tenure in Panama City,

unless plaintiff can offer concrete proof of *objectively* severe and consistent hostile actions, his claim cannot be sustained.  Plaintiff has not met this "sufficiently demanding standard." *See Faragher*, 524 U.S. at 788.  Accordingly, the Court will grant the Department's motion for summary judgment on plaintiff's hostile work environment claim.

## V.     RETALIATION CLAIM

Finally, in his cross-motion for summary judgment, plaintiff for the first time seeks to raise a claim of retaliation. (*See* Pl.'s Cross-Mot. for Summ. J. [63] at 39–40.) Plaintiff had an opportunity to raise this claim in his original complaint or by filing an amended complaint soon afterward to assert the claim. Unfortunately, plaintiff chose neither route. (*See* Morgan Dep. 300:2–18, Feb. 23, 2009.) Because of this omission, this Court has no choice but to dismiss the retaliation claim as untimely and need not reach the merits. FED. R. CIV. P. 15(a)(2) (noting that in all cases where a party cannot as a matter of course amend, "a party may amend its pleading only with the opposing party's written consent or the court's leave"); *see also Sharp v. Rosa Mexicano, D.C., L.L.C.*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (stating that a plaintiff may not, "through summary judgment briefs, raise . . . new claims . . . because plaintiff did not raise them in his complaint, and did not file an amended complaint"). Thus, plaintiff is barred from bringing this claim and it shall be denied.

## VI.    CONCLUSION

For the foregoing reasons, defendant Thomas Vilsack's Motion for Summary Judgment [55] shall be GRANTED and plaintiff Juan Morgan's Cross-Motion for Summary Judgment [63] shall be DENIED.

A separate order shall issue this date.

**Date**

June  7, 2010.

_____/s/_____
ROYCE C. LAMBERTH
Chief Judge
United States District Court